**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NICHOLAS TAPIA** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 10170 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Nicholas Tapia ("Plaintiff" or "Tapia") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act in a June 19, 2013 written decision of Administrative Law Judge ("ALJ") Michael Logan. Tapia appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross motion.

The Court does not discuss the medical record except as noted below. In brief, Tapia suffers from atrophy of his right leg due to the effects of childhood polio. He has a nine centimeter difference between the distal right and left thighs, and a four centimeter difference between the right and left distal calf. Tapia underwent surgery as a teenager to lessen his leg discrepancy but still walks with a limp. His right leg strength is also reduced, coming in at 2 out of 5 rather than the 5 out of 5 he has in his left leg. Tapia also experiences periodic grand mal seizures for which he takes the anti-seizure medication

Dilantin. He has not been diagnosed with epilepsy. However, Tapia testified that loud noises such as those from loud speakers or public address systems trigger seizures. Even the sound of a phone or radio can pose problems. As a result, he hesitates to enter stores or even to speak with his attorney on the phone lest he risk having a seizure. Because he has no health insurance, Tapia rarely calls an ambulance when he has a seizure, and he only sees his doctor with relative infrequency.

Applying the familiar five-step analytic procedure, ALJ Logan found at Step 1 that Tapia had not engaged in substantial gainful activity since his alleged onset date of May 19, 2010. Tapia's severe impairments at Step 2 were a seizure disorder and atrophy of the right leg. Neither of these impairments met or equaled a listing at Step 3 either singly or in combination.[1] Before moving to Step 4, the ALJ concluded that Tapia's statements about the frequency and severity of his symptoms deserved slight weight. He reached the same conclusion concerning the brief testimony given by Plaintiff's wife, as well as written statements provided by his siblings. He also assessed Tapia's residual functional capacity ("RFC"). ALJ Logan found that Tapia could perform sedentary work as long as various non-exertional limitations were in place. Based on these findings, the ALJ concluded at

---

[1] ALJ Logan reached that conclusion by relying on the testimony of two medical experts who appeared at the two administrative hearings held in this case. Dr. Ronald Semerdjian stated on February 5, 2013 that Tapia's condition did not meet a listed impairment. The ALJ said that Dr. Walter Miller had reached the same conclusion at the June 22, 2012 hearing. (R. 23). That was incorrect. Dr. Miller never stated that Tapia's impairments met or equaled a listing. To the contrary, he testified that he could not reach any conclusion about Tapia's disability. (R. 131, "So he needs to be evaluated by a neurologist. He needs to be treated by a neurologist before we say anything about his disability, as far as I'm concerned."). The ALJ's misstatement does not require remand in itself. Nevertheless, he is directed to correct his oversight on remand and to accurately account for the record. As it stands, the ALJ gave moderate weight to Dr. Miller's testimony, even though the expert said he could not make any disability findings.

Step 4 that Plaintiff could not carry out his past relevant work. A vocational expert ("VE") testified that a substantial number of jobs existed in the national economy that Tapia could perform. The ALJ therefore concluded that Tapia was not disabled.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to

3

be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668,

4

673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Discussion

Tapia challenges the ALJ's findings by arguing that he (1) incorrectly assessed his credibility, (2) improperly fashioned the RFC, and (3) erred at Step 5. The Court easily concludes that the ALJ erred on each issue, though he did so for reasons that Tapia largely fails to recognize.[2]

### A. Credibility

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any

---

[2] The Court does not comment further on the relevance of Tapia's arguments. That issue is more appropriate in the context of a motion for attorney's fees, should the Commissioner decide to contest such a request.

medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

As noted, ALJ Logan gave only slight weight to Tapia's credibility. Throughout his decision the ALJ relied heavily on what he thought was Tapia's testimony that he suffered from frequent seizures. The ALJ cited records from 2010 and 2011 to refute that claim. (R. 21). The problem with this is that the ALJ failed to explain why the objective record of Tapia's treatment for seizures was an accurate index of his credibility on the issue. This error involves the ALJ's oversight of two aspects of the record and Plaintiff's testimony. First, it is not the case that the record does not reflect increased seizures during Tapia's disability period. In May 2011, Dr. Michele Barnes noted that Tapia told her that he had been suffering from increased seizures during the past year but "has not reported this to neurology." (R. 435). He made the same complaint in July 2013, when he told his health care provider that he was having two seizures a month – the same number that he and Ms. Tapia claimed at the hearing. That supports, rather than undermines, Tapia's credibility.

Second, the ALJ made no effort to account for Tapia's explanation of why the record did not reflect more frequent treatment for seizures – he lacks health insurance. Tapia told the ALJ that he usually does not call an ambulance after having a seizure because he cannot afford to pay for it without insurance. (R. 44, 47, 51). The record clearly shows that Tapia received less care at times because of his lack of insurance. No lab testing was done in December 2010 for that reason. (R. 380, "No lab testing for now – no insurance"). Tapia even lied about the severity of his symptoms at one point to avoid having to pay for

6

a work up. (R. 433). The ALJ ignored Tapia's testimony on the insurance issue entirely, even though he went on to discount Plaintiff's credibility for the infrequency of his medical treatment, limited physical therapy, and the absence of surgery or injections to control pain. That was seriously erroneous. The ALJ was not entitled to discount Tapia's credibility without first accounting for the reasons that Plaintiff gave. SSR 96-7p instructs ALJs that they "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."

The ALJ also cited Tapia's compliance with taking his seizure medication. He did not think that Tapia's seizure disorder would pose disabling limitations because "the record indicates the claimant's seizure activity occurs when he is not taking enough Dilantin but that it is controlled when he takes his Dilantin in the proper dosage and maintains therapeutic levels." (R. 22). The Commissioner does not attempt to defend this claim. That may be because the ALJ cited no evidence to support it. Dr. Semerdjian testified that Tapia had been hospitalized due to a seizure in 2010 because he was not taking the full dosage of Dilantin that had been prescribed. (R. 72). The expert never claimed, however, that Tapia's condition would be controlled as long as he maintained a therapeutic level of Dilantin, or even what such a level would be. Therapeutic serum levels for Dilantin range from 10 to 20 mcg/ml. http://www.drugs.com/pro/dilantin.html. The ALJ overlooked that Tapia's measurements ranged from as low as 8 to as high as 27. (R. 502). On July 17, 2013 it was 18.5, well within the treatment level. (R. 501). Notwithstanding, Tapia had experienced a seizure only two weeks earlier. (R. 492). A medical report dated April 28,

7

2011 also states that Plaintiff was having breakthrough seizures despite the fact that he was taking his medication regularly. (R. 433). This evidence strongly suggests that Dilantin may not have been sufficient alone to control his seizures even though Tapia's serum level was within the therapeutic range. ALJ Logan was not entitled to discredit Tapia's testimony on this ground without noting the record and explaining how he reached his conclusion.[3]

Social Security Ruling 96-7p further instructs ALJs that they are required to consider "factors that precipitate and aggravate the symptoms" a claimant experiences. Tapia was very clear on this topic. He told ALJ Logan that loud noises, loudspeaker announcements, or even telephones could trigger a seizure. (R. 63, 64). His attorney stated that Tapia's family had to bring him into his office for a consultation because using a phone could induce a seizure. (R. 94, 99). Tapia avoids going into stores so as not to risk having a seizure triggered by loud noises or announcements. Plaintiff made similar claims to his physicians and medical treaters throughout the record. (R. 437, 485, 488, 492). ALJ Logan's only account of this issue involved a passing reference to Tapia's June 2011 statement to his neurologist that he had recently experienced a seizure due to a

---

[3] Both testifying experts expressed puzzlement over the fact that Plaintiff only took Dilantin instead of newer seizure medications. The ALJ seems to have thought that Tapia's condition would be fully resolved if he took these medications (though it is not entirely clear what the ALJ meant by citing the experts' testimony). But the fact that Tapia took the medication that was actually given to him is not a ground for discounting his credibility. A claimant cannot be held responsible for the advice a doctor provides. Moreover, the ALJ had no evidence before him as to why Plaintiff's treating neurologists and physicians continued to prescribe only Dilantin. For all he knew, these medical experts (who were far more familiar with Tapia's condition than the testifying doctors were) may have had a valid reason for doing so. Insofar as the ALJ intends on remand to rely on this issue, he should explain with greater care the reason for citing it and the clarify the role it plays in his analysis.

loudspeaker. (R. 28). The ALJ neither noted the full extent of Tapia's claims on this critical issue, nor made any attempt to gauge their credibility. That was erroneous. Plaintiff's statements, which potentially involve severe restrictions on his ability to work, remain undisputed absent any consideration by the ALJ.

Finally, the ALJ thought that Plaintiff had made inconsistent statements about the pain he experienced from his polio-related leg and knee problems. The Court finds the ALJ's citations unpersuasive. He noted that Tapia told one doctor in January 2011 that he suffered from right knee and back pain at levels of 8 and 6 out of 10 respectively. The ALJ thought that was dubious because five months later Plaintiff did not mention pain in the right knee. Any problem involved in this alleged discrepancy lies with the ALJ's reading of the record, not with Tapia's credibility. Tapia actually told the consulting doctor in January 2011 that his "aching [knee] pain" was the result of cold weather. (R. 409). He also complained about the effects of winter weather at the second administrative hearing. (R. 57). The fact that Plaintiff did not have the same pain five months after the consultation the ALJ cited is not surprising. It was summer at that point (June 29), far outside the cold weather that Tapia said triggered the pain in question. (R. 418).

Even if that were not the case, the ALJ failed to explain why a pain that manifests at one time, but is not present five months later, constitutes a fatal contradiction in Tapia's testimony. The same is true of the ALJ's next reason. He was troubled by the fact that Tapia alleged pain in his left knee in April 2011 but reported a "slight improvement" two months later. (R. 21). Yet common sense suggests that a minor improvement over a two-month period is not a ground for finding that a claimant is not credible. Conditions *do* fluctuate or even improve over time. Indeed, SSR 96-7p tells ALJs that they are not

9

entitled to jump to the kind of conclusion that ALJ Logan reached without supporting their finding with proper reasoning. "Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms." SSR 96-7p. The ALJ erred by giving no heed to this directive. Plaintiff's motion is granted on the credibility issue.

### B. The RFC

The ALJ concluded that Tapia could carry out sedentary work as long as various non-exertional limitations were in place.[4] The Court agrees with Plaintiff that the ALJ failed to build a logical bridge between the record and the assessment.

The ALJ said that Tapia would experience a five percent reduction in his concentration and productivity. (R. 24). It is impossible to discern what reasoning led to that conclusion. The ALJ cited nothing in the record to support his finding. No medical expert testified on the issue. The Commissioner claims that this limitation stemmed from the ALJ's assessment of Tapia's pain. As shown above, however, the ALJ incorrectly assessed Tapia's testimony on that issue by erroneously citing what the ALJ thought were pain-related contradictions. He also failed to address Tapia's testimony that he

---

[4] That said, the ALJ also found that Plaintiff could stand and walk from two to four hours during a normal work day. (R. 24). Sedentary work only demands that a claimant be able to stand and walk occasionally. 20 C.F.R. § 404.1567(a). "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday." SSR 96-9p. The ALJ doubled that requirement to four hours a day. The Court also notes that the RFC includes activities like an ability to "feed self, bathe self, and engage in personal hygiene." (R. 24). The inclusion of such personal behaviors is harmless in itself, though it is very difficult to understand how they are relevant to what Tapia can do in the workplace.

experienced sleepiness as a result of taking Dilantin. (R. 108). Drowsiness is a well-recognized side effect of Dilantin. www.rxlist.com/dilantin-side-effects-drug-center.htm. Further, the ALJ overlooked everything that Plaintiff and his wife said about his problems with memory and concentration. Ms. Tapia testified, for example, that she had to remind Plaintiff to take his seizure medication. (R. 121). Plaintiff said that he forgets things and cannot even remember how often he has seizures. (R. 45, 115). An ALJ is always obligated to provide a narrative discussion "describing how the evidence supports each conclusion, citing specific medical facts . . and nonmedical evidence." SSR 96-8p. By failing to account correctly for all that Plaintiff said on pain, or anything that he said about sleepiness and forgetfulness, the ALJ did not comply with this directive. The result is that the Court is unable to trace the path that led to the ALJ's conclusion that Plaintiff would experience a five percent limitation. Why not 10 or even 15 percent? The ALJ never said.

As noted, he also overlooked Tapia's testimony on how loud noises could trigger seizures. The ALJ never explained why Tapia would be able to work in a setting that did not limit such noises. He could not exclude that potential restriction without noting what Tapia said on the matter and explaining why it was either not credible or not a concern that warranted a more restricted work environment. A claimant who cannot go into a store, or even talk to his attorney on the phone, without risking a seizure may well have difficulty in working on a sustained basis in an environment that does not accommodate this alleged restriction. As it stands, it is impossible to follow how the ALJ concluded that no sound-related restriction was necessary in the RFC.

The same is true for testimony that both Tapia and his wife gave on his ability to sit. Tapia testified that he had to get up every 30 minutes because of pain and numbness in

his leg. That almost certainly means that he could not carry out on a sustained basis the RFC that the ALJ assessed. The ALJ again failed to note that testimony, or explain how Tapia could work full time under the current RFC.[5] SSR 96-8p obligated him to discuss the issue directly. Indeed, the Seventh Circuit has recently re-emphasized the importance of SSR 96-8p's instruction. *See Forsythe v. Colvin*, — F.3d —, 2016 WL 626037, at *3 (7th Cir. Feb. 17, 2016) ("Although the [ALJ] ruled that the plaintiff is not totally disabled, he gave no reason for thinking that the plaintiff could actually work for eight hours a day, forty hours a week, missing no more than a couple of days a months . . . . The [ALJ] seemed not to understand that the question he had to answer was . . . whether [claimant] was . . . able to hold down a 40-hour-a-week job outside the home.").

These oversights, combined with the flawed credibility analysis, are sufficient to warrant remand in themselves. Nevertheless, the Court notes an additional problem with the ALJ's decision. The medical expert testified that Tapia's muscle atrophy was the result of his childhood polio.[6] The ALJ noted a possible link between atrophy and polio. Plaintiff

---

[5] The ALJ may have thought that he was addressing the issue by noting some of Dr. Semerdjian's testimony at the second hearing. The medical expert stated that a consulting physician found that Tapia's peripheral pulses were intact. (R. 24, 75, 411). But Dr. Semerdjian also advised the ALJ that the consulting doctor had only evaluated Tapia's artery flow by hand. He suggested that more definitive testing remained to be taken. (R. 75, "But she didn't, she didn't do an ankle-brachial index, which would actually be an objective numeric measurement of flow."). Neither the medical expert nor the ALJ explained how the consulting doctor's manual assessment fully addressed the credibility of Tapia's claim. Moreover, Plaintiff also stated that he needed to stand because of pain. The ALJ never discussed the pain aspect of this claim at all.

[6] The medical expert thought that the muscle atrophy could be analyzed at Step 3 under listing 11.08 ("spinal cord or nerve root lesions, due to any cause"). Social Security Ruling 03-1p states that the correct listing is 11.11 ("anterior poliomyelitis") if postpolio sequelae is present. For his part, the ALJ never cited *any* listing related to Tapia's muscle atrophy. The Court does not address the issue further because Plaintiff does not raise it.

12

claims that this was insufficient because the ALJ did not go on to consider SSR 03-1p, which addresses the evaluation of the ongoing effects of polio ("postpolio sequelae"). Postpolio sequelae involves the residual effects of an acute infection of polioencephalomyelitis. The condition may involve many, or just one, of the lingering or late-onset effects of polio. SSR 03-1p ("Any one or a combination of these disorders . . . will constitute the presence of postpolio sequelae."). "For example, an individual with a history of polio affecting the left lower extremity who, on examination, has weakness and atrophy of the left thigh musculature" may suffer from that condition. SSR 03-1p. That sounds very much like Tapia. Indeed if "right" were substituted for "left," this description could be lifted directly from his medical records. The standard for finding postpolio sequelae is not exacting. An ALJ should identify it "as long as the medical findings support a reasonable medical link between the prior polio infection and the present manifestation of any one or combination of the disorders discussed" in the Ruling. SSR 03-1p.

The Commissioner claims that the ALJ did not err in ignoring SSR 03-1p because he accounted for all of the limitations that stemmed from Tapia's muscle atrophy. The Commissioner seems to suggest that the ALJ would have had nothing else to say on the matter, or would have reached the same conclusion, had he considered the issue under the terms of SSR 03-1p. That is to say, the ALJ's failure to discuss the issue only amounts to harmless error. The Commissioner cites no authorities for this proposition, though they do exist. *See Spencer v. Astrue*, 2012 WL 6569483, at *4-5 (D. Or. Dec. 17, 2012); *Rainey v. Astrue*, 2012 WL 3779167, at *9 (W.D. Pa. Aug. 31, 2012). The government's position

---

The ALJ is directed on remand to identify the relevant listing and explain why Tapia does not meet or medically equal it.

is not entirely unreasonable, at least when the facts suggest that an ALJ properly evaluated all of a claimant's symptoms that could reasonably be attributed to postpolio sequelae. In this case, however, three concerns require a different conclusion.

First, courts in this district have expressed serious hesitation about finding that postpolio sequelae (or postpolio syndrome, as it is also called) can be adequately accounted for in all cases on the terms the government states. In *Kenefick v. Astrue*, 535 F. Supp.2d 898, 906 (N.D. Ill. 2008), the court remanded an ALJ's decision that failed to reference the claimant's history of polio or address her claim that she suffered from postpolio syndrome. *Kenefick* based its reasoning, in part, on the Commissioner's directive that an ALJ must "consider only impairment(s) you say you have or about which we receive evidence." *Kenefick*, 535 F. Supp.2d at 906 (citing 20 C.F.R. § 404.1512(a)). Both conditions were met in that case; the claimant alleged an impairment of postpolio syndrome, and medical evidence existed on the issue. The same is true here. The ALJ himself recognized that Tapia alleged disability due to polio. (R. 24). In addition, the record clearly supported the existence of postpolio sequelae. Tapia was diagnosed with the "late effects of acute poliomylitis," and Dr. Semerdjian told the ALJ at the second hearing that Plaintiff's atrophy was "presumably post-polio." (R. 74, 138). That should have alerted the ALJ that he was obligated to pursue the issue in at least minimal form. His failure even to recognize the issue or to consider SSR 03-1p was erroneous. *See Unger v. Barnhart*, 507 F. Supp.2d 929, 939 (N.D. Ill. 2007) ("[T]he ALJ should have evaluated and discussed the aforementioned medical evidence and the ME's testimony and determined whether or not it was sufficient to find that Claimant suffered from postpolio syndrome.").

Second, the Commissioner's position rests on the assumption that Tapia's muscle atrophy and postpolio syndrome are identical in all respects; accounting for the first disorder under this reasoning would function as an analysis of the second. But SSR 03-1p suggests that muscle atrophy and postpolio sequelae do not necessarily constitute equivalent impairments. The Ruling refers to postpolio sequelae as a potentially progressive disorder that may involve a continuing deterioration in a claimant's functioning. It states, for example, that "[w]eakness, fatigue, or muscle and joint pain may cause *increasing* problems in activities such as lifting, bending, prolonged standing, walking . . . and any activity that requires repetition or endurance. . . . A previously stable functional capacity may be further diminished." SSR 03-1p ("The signs and symptoms include fatigue, slowly *progressive* muscle weakness, and, at times, muscular atrophy.") (emphasis added). This Court cannot make medical conclusions on the topic. But if postpolio sequelae is progressive, then the ALJ was required to account for that fact in the disability analysis. *See Hill* v. *Colvin*, 807 F.3d 862, 868-69 (7th Cir. 2015) (citing *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013)). The issue was more than theoretical. Plaintiff strongly suggested in his testimony that his condition was getting worse over time. He said that he was becoming "weaker," that his upper extremity strength had "gotten worse," and that his lower extremity was "getting worse." (R. 55, 123). The ALJ failed to address any of these claims, or to consider if they were related to postpolio sequelae. That makes it difficult to conclude that he considered the combined effects of all of Tapia's severe and non-severe impairments in fashioning the RFC, as he was required to do. *See* SSR 03-1p ("[T]he adjudicator must make a comprehensive assessment of the cumulative and interactive effects of all of the individual's impairments and related symptoms, including the effects

of postpolio seqeluae.").

Third, even if the Commissioner is correct concerning Tapia's muscle atrophy, the same cannot be said about his alleged memory deficits. Tapia and his wife complained at some length that he had significant problems recalling things, including the need to take his medication on a regular basis. The ALJ overlooked this line of testimony completely. He neither noted Plaintiff's statements nor said why they were not credible. Tapia's memory deficits could have been related to his post-polio condition, his seizure condition, or both. Social Security Ruling 03-1p states that "[s]ome polio survivors report the onset of problems with attention, concentration, cognition, or behavior. . . . Deficits in attention . . . may be demonstrated by reduced concentration capacity . . . or memory problems." By failing to assess the memory issue in relation to Plaintiff's seizure disorder, the ALJ necessarily failed to consider it in relation to postpolio syndrome. Had he considered the issue, the ALJ might have concluded that Tapia's concentration would be reduced by more than the five percent that the ALJ included in the RFC. An ALJ errs by not considering SSR 03-1p when a claimant's symptoms are linked to postpolio sequelae. *See*, e.g., *Smallwood v. Astrue*, 2009 WL 2900707, at *15 (N.D. W.Va. Sept. 8, 2009). Since the ALJ did not even recognize SSR 03-1p, it is impossible to conclude that he accounted for the combined effect of all of Plaintiff's severe and non-severe impairments. Plaintiff's motion is granted on the RFC issue.

### C. Step 5

Plaintiff further claims that ALJ Logan erred in the questions he posed to the VE at Step 5. "Ordinarily, a hypothetical question to the vocational expert must include all

16

limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). The Court agrees with Plaintiff that the ALJ erred at Step 5.

The ALJ's first hypothetical question to the VE accounted for most of the relevant restrictions that the ALJ included in the RFC. The VE identified three jobs that such a person could perform – a cashier, an inspector, and an assembler. Each job was available in significant numbers. The second hypothetical then added the following limitation: "the hypothetical person has to avoid working around loud speakers [and] public address systems." The VE said that this restriction would reduce the number of jobs available in each of the three categories he had just identified by 30 percent. The ALJ then asked in the third hypothetical what would happen if the individual had one seizure a year and had to be transported to the hospital. The VE said that "would not be a problem." (R. 84).

This line of questioning was inadequate. The second hypothetical only asked the VE to account for an inability to work around "loud speakers [and] public address systems." (R. 83). But Tapia testified that he was far more sensitive to noise than what could be expected from these large-scale instruments. Even less intrusive noises such as those produced by radios and telephones could trigger a seizure. (R. 63). Plaintiff testified that he could not walk into a store or even speak with his attorney on the phone lest he suffer a seizure. He requires his wife or sisters to answer the phone. (R. 99). ALJ Logan never questioned those claims, or even noted most of them in the decision. This leaves Tapia's statements uncontested. That, in turn, means that the ALJ never provided a ground as to why his second hypothetical question could be limited to loud speakers and public address systems instead of the full range of noises that Tapia said bothered him.

Had the ALJ included all that Tapia testified to, the available job base might have

been reduced by more than the 30 percent that the VE identified. It could also have meant that the hypothetical individual would require more than one trip to the hospital each year due to a seizure on the jobsite. Either possibility could have required a finding that Tapia was disabled. The Court cannot say that the ALJ's failure to assess Tapia's statements fully was merely harmless. Only the VE has the expertise to decide what jobs would be available to Tapia and in what numbers when all of his limitations are taken into account. The ALJ is directed to evaluate all of Tapia's testimony concerning his seizures, and to question the VE on all limitations that the record supports. Plaintiff's motion is granted on the Step 5 issue.

### III.  Conclusion

Plaintiff Nicholas Tapia's Motion for Summary Judgment [19] is granted. The Commissioner's cross motion [27] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

On remand, the ALJ is ordered to: (1) identify the listing related to Tapia's muscle atrophy and explain why he does not meet or equal it; (2) restate the credibility analysis by evaluating the full scope of Tapia's testimony and by properly applying SSR 96-7p; (3) reassess the RFC; (4) consider the applicability of SSR 03-1p, and (5) reconsider what hypothetical questions should be posed to the ALJ in light of the credibility and RFC analyses.

ENTERED:

Date: March 8, 2016

_____
DANIEL G. MARTIN
United States Magistrate Judge